PLASTRAY CORPORATION v. COLE.

1. APPEAL AND ERROR—JURISDICTION OF TRIAL COURT—CLAIM OF APPEAL—DISPOSITION OF MOTIONS.

Motions for leave to file an amended bill of complaint and to modify order dismissing original bill of complaint were properly denied by trial court after filing of claim of appeal from order of dismissal on the asserted ground that the trial court then lacked jurisdiction to hear such motions.

2. SAME—JURISDICTION OF TRIAL COURT—CLAIM OF APPEAL—PLEADINGS ON FILE.

Where an amended bill of complaint and motion for leave to file it were both filed prior to the filing of a claim of appeal the trial court was without jurisdiction to strike the amended bill from the files.

3. PLEADING—COURT RULES—AMENDED BILL.

Provisions of court rule permitting a plaintiff, at any time before answer is put in or within 15 days thereafter, to amend his bill of complaint, apply to cases pending in the trial court, not to those already dismissed, hence an amended bill may not be filed, without leave granted, after dismissal of the original bill (Court Rule No. 26, § 1 [1945]).

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 3 Am. Jur., Appeal and Error, § 528.
[3] 41 Am. Jur., Pleading, § 296.
[5, 9] 40 Am. Jur., Patents, § 147.
[7] 12 Am. Jur., Contracts, § 79.
[8] 40 Am. Jur., Patents, § 145.
[8] Right of manufacturer, producer, or wholesaler to control resale price.  7 A.L.R. 477, 19 A.L.R. 928, 32 A.L.R. 1088, 103 A.L.R. 1336, 125 A.L R. 1335.
[10] 40 Am. Jur., Patents, § 133.
[12] 49 Am. Jur., Specific Performance, § 38.
[12] Specific performance of contract for sale of corporate stock. 22 A.L.R. 1060, 130 A.L.R. 920.
[14] 3 Am. Jur., Appeal and Error, § 932.

4. Patents—Construction of Contract for License—Future Inventions.

A contract by patentee that he granted to his licensee the exclusive right to manufacture articles constituting licensed subject matter, defined as covering patents, applications, inventions and improvements already existing or which may be owned or controlled by the owner during the life of the agreement clearly covered future inventions, improvements and patents or applications therefor owned or controlled by the patentee during the life of the agreement.

5. Same—Effect of Contract Granting Exclusive Rights.

The effect of a patentee's agreement granting plaintiff manufacturer the exclusive manufacturing rights and reserving to plaintiff distributor the right to sell the articles so manufactured is an agreement on the patentee's part to refrain from competition, notwithstanding the absence of an express agreement so to refrain.

6. Same—Contract Granting Exclusive Rights—Consideration.

While it would be possible to discern a benefit flowing to patentee by reason of assignment of exclusive right to manufacture the article to plaintiff manufacturer whereby manufacturer became obligated to corporation of which patentee became president and sales representative yet the mere fact of detriment suffered by the manufacturer was sufficient consideration to support the patentee's agreement assigning exclusive rights.

7. Contracts—Consideration.

Consideration for an agreement may consist of a benefit on one side or a detriment suffered, or service done on the other but the benefit need not be to the promisor, it being sufficient if another party derives the benefit.

8. Patents—Contract Assigning Exclusive Manufacturing Rights—Illegal Restraint of Trade—Public Policy—Statutes.

Since the exclusive right to manufacture and sell patented articles or devices is granted by Federal law to the patentee, his heirs or assigns, a contract assigning the exclusive right to manufacture is not unenforceable as an unlimited restraint on trade and void under public policy and statutory law (35 USCA, § 40; § 47, as amended by 55 Stat. at L. 634; 3 Comp. Laws 1929, § 16667).

9. SAME—EXCLUSIVE RIGHT TO MANUFACTURE AND SALE.

A patentee who has divested himself of the exclusive right to manufacture and sell patented articles or devices may not himself exercise such rights (35 USCA, § 40; § 47, as amended by 55 Stat. at L. 634).

10. SAME—ASSIGNMENT OF FUTURE PATENTS—ENFORCEMENT OF AGREEMENT.

An agreement to assign future patents may be enforceable.

11. SPECIFIC PERFORMANCE—DOCTRINE OF MUTUALITY OF REMEDY—APPLICATION.

Application of the doctrine of mutuality of remedy in a suit involving the specific performance of an agreement is usually a question of what justice requires under the circumstances of a particular case.

12. PATENTS—SPECIFIC PERFORMANCE OF CONTRACT ASSIGNING EXCLUSIVE RIGHTS—MUTUALITY OF REMEDY.

A patentee who granted the exclusive right to manufacture patented devices to plaintiff manufacturer under an agreement whereby such plaintiff obligated itself to pay $30,000 for sales promotion to plaintiff sales corporation of which defendant, the patentee, became president and sales representative, would not be entitled to escape specific performance of the assignment contract after the manufacturer had paid the $30,000 and spent $100,000 for tooling and equipment merely because the licensee had the sole right to terminate the agreement as the doctrine of mutuality of remedy would not be there applied since it would operate unjustly and unconscionably.

13. SPECIFIC PERFORMANCE—EXECUTORY CONTRACT—MUTUALITY OF REMEDY—CONTINUANCE OF PERFORMANCE BECAUSE OF STRONG ECONOMIC INTEREST.

Specific performance of an executory agreement will not be denied because continuing performance was terminable by plaintiff but not by defendant where default on the part of plaintiff is highly improbable due to existence of a strong economic interest.

14. APPEAL AND ERROR—MOTION TO DISMISS—WELL-PLEADED FACTS.

On appeal from order dismissing bill of complaint, the Supreme Court does not undertake to pass on the facts, but merely takes well-pleaded facts in the bill as true.

Appeal from Wayne; Ferguson (Frank B.), Murphy (George B.), and Maher (Thomas F.), JJ. Submitted January 13, 1949. (Docket No. 39, Calendar No. 44,256.) Decided April 11, 1949.

Bill by Plastray Corporation and another against Arthur E. Cole for an injunction, accounting and money damages. Bill dismissed on motion. Motion for leave to file amended bill of complaint and motion to modify order of dismissal denied. Plaintiffs appeal. Reversed and remanded.

*George B. Wells (Douglas L. Jocelyn,* of counsel), for plaintiffs.

*Clark, Klein, Brucker & Waples,* for defendant.

DETHMERS, J. Defendant's motion to dismiss plaintiffs' bill of complaint was granted on July 7, 1948. On July 9th, plaintiffs filed an amended bill. On July 26th, they filed a motion for leave to file the amended bill and a motion to modify the order dismissing. On July 27th, they filed a claim of appeal from the order dismissing. On July 30th, the amended bill was ordered stricken from the files. On August 6th, the court entered orders denying the two motions filed July 26th on the ground that it was without jurisdiction to hear them after a claim of appeal had been filed. Subsequently, plaintiffs took appeals from the three orders last mentioned.

The motions for leave to file an amended bill and to modify the order dismissing were properly denied for the reasons advanced by the trial court. *Losie* v. *Losie,* 321 Mich. 112. By the same token, the court was without jurisdiction on July 30th to order the amended bill stricken from the files. However, after the order dismissing had been entered plaintiffs could not, without leave granted, file an amend-

ed bill. The provisions of Michigan Court Rule No. 26, § 1 (1945), permitting a plaintiff, at any time before answer is put in or within 15 days thereafter, to amend his bill of complaint, apply to cases pending in the trial court, not to those already dismissed.

Was plaintiffs' original bill of complaint properly dismissed? It alleges that the plaintiffs, hereinafter called Plastray and Standard, respectively, and the defendant, Cole, entered into a tripartite agreement which named Plastray as party of the first part, Cole as party of the second part, and Standard as party of the third part. The agreement recited that Plastray was the owner by assignment of certain patents granted to Cole and applications for patents in his name and of the inventions or improvements therein disclosed; that as used in the agreement the term "licensed subject matter" included said patents, applications, inventions and improvements "together with all other patents, patent applications, inventions and improvements relating to ice or liquid freezing trays, receptacles and devices *owned or controlled by* Plastray and *Cole* both jointly and individually *during the life of this agreement;* " that Standard was desirous of acquiring an exclusive manufacturing license under said "licensed subject matter" and that both plaintiffs were desirous of jointly promoting and conducting the manufacture and sale of articles embodying or relating to said "licensed subject matter." The agreement provided that "Plastray and Cole hereby grant unto Standard the exclusive right and license to manufacture liquid or ice freezing trays, cups and receptacles (hereinafter for convenience called articles or devices) under or constituting said licensed subject matter throughout the United States of America and its territorial possessions, said license to extend to the end of the latest patent comprehended by or included in said

licensed subject matter unless sooner terminated as herein provided." Standard agreed to manufacture the articles for sale only by Plastray and to ship to and collect from Plastray's customers, remit specified amounts from collections and pay certain royalties to Plastray. The latter agreed to organize and maintain a sales force and organization to promote sales and obtain orders. To help defray initial sales promotion expenses Standard agreed to pay Plastray $10,000 upon execution of the agreement and another $20,000 within 6 months. Standard also agreed, in effect, not to sell articles included in the "licensed subject matter" except under license from Plastray. Standard was given the right to terminate the agreement upon giving 6 months' notice, in which event it was to discontinue the manufacture of articles covered by "licensed subject matter" and the use of trade-marks developed under the agreement. It was agreed that "neither this agreement nor any of the rights or obligations arising thereunder shall be assignable by either party without the written consent of all parties." The agreement was signed by defendant, Cole, individually and as president of Plastray.

Plaintiffs' bill alleges that pursuant to the contract Standard spent over $100,000 in tooling and equipping itself for the manufacture of the licensed articles; that Plastray spent over $50,000 in sales promotions, et cetera; that, in violation of the agreement and in competition with plaintiffs, Cole has produced and sold articles which constitute "licensed subject matter;" that defendant had been sales representative for Plastray and, as such, had contacted its customers, with whom he is now dealing in competition with and to the damage of plaintiffs; that plaintiffs have suffered resultant damage in loss of profits and of good will. The bill prays that defendant be enjoined from producing and

selling "licensed subject matter;" that plaintiffs be awarded damages for loss of profits and good will; that defendant be required to make an accounting in connection with his sales; that he be required to assign and turn over to plaintiffs the manufacturing and selling rights to any ice or liquid freezing trays now being produced or sold by him, together with all designs and drawings in connection therewith.

It is defendant's position that plaintiffs are not entitled to the relief sought because, under the agreement, (1) defendant is not required to assign future inventions, improvements and patents, (2) he does not agree to refrain from competition with plaintiffs and (3) he receives no benefits. (1) The agreement provides that Plastray and Cole grant to Standard the exclusive right and license to manufacture articles constituting "licensed subject matter." The latter is defined as covering patents, applications, inventions and improvements already existing or which may be owned or controlled by Cole during the life of the agreement. This clearly covers future inventions, improvements and patents or applications therefor owned or controlled by Cole at any time during the life of the agreement. (2) Although the contract does not contain an express agreement by Cole to refrain from competition with plaintiffs in the manufacture and sale of articles included in "licensed subject matter," nevertheless, his grant to Standard of the exclusive manufacturing rights and the reservation to Plastray of the right to sell the articles so manufactured have precisely that effect. (3) It should not be difficult for the courts to discern in the contract a benefit flowing to defendant, who had assigned his patents to Plastray Corporation, became its president and sales representative, and then entered individually and as such president into an agreement whereunder

Standard became obligated to Plastray in the respects above noted. Be that as it may, a consideration did move from Standard to Plastray. As said in *Arctic Dairy Co.* v. *Winans*, 267 Mich. 80 (94 A. L. R. 334):

" 'The rule as to consideration for agreements * * * there must be a benefit on one side, or a detriment suffered, or service done on the other. *The benefit rendered need not be to the party contracting, but may be to anyone else at his procurement or request.' Sanford* v. *Huxford* (syllabus), 32 Mich. 313 (20 Am. Rep. 647). * * *

" 'There are many cases in which there is a detriment to the promisee with no corresponding benefit to the promisor. Sometimes the benefit is derived solely by a third person. Hence the consideration to support a promise need not involve benefit to the promisor.' 6 R. C. L. p. 655.

" 'Consideration moving from promisee, but not to promisor. The consideration may consist of a legal right which B gives up often to some third person, X, and of which A does not receive the benefit. Such consideration is sufficient.' 1 Page on Contracts, § 529. * * *

" 'Damage to the promisee constitutes as good a consideration as benefit to the promisor.' * * *

" 'A consideration which, by the terms of the contract, the promissee furnishes to a third person and not to the promisor is sufficient.' 1 Page on Contracts, 1919–1929 Supp. § 529, citing several cases."

Defendant contends that the contract, as above construed, is unenforceable as an unlimited restraint on trade, void under public policy and statutory law. See 3 Comp. Laws 1929, § 16667 * (Stat. Ann. § 28.61). This statute declares to be against public policy, illegal and void certain contracts by which persons agree not to engage in any vocation,

---

* 3 Comp. Laws 1948, § 445.761.—REPORTER.

employment, pursuit, trade, profession or business. Such is not the situation in the instant case. Federal law grants the exclusive right to manufacture and sell patented articles or devices to the patentee, his heirs or assigns. 35 USCA, § 40. The patentee is permitted to assign his rights or to issue licenses thereunder. 35 USCA, § 47 (as amended Aug. 18, 1941, chap. 370, 55 Stat. at L. 634). This the defendant has done here. The right to manufacture and sell the devices being, under Federal law, exclusive in those holding the patent rights, and defendant having divested himself of those rights, he may no longer exercise them. We have held agreements to assign future patents enforceable. *Zagelmeyer* v. *Laughray Concrete Brick Co.*, 169 Mich. 589. See, also, *Wright* v. *Houdaille-Hershey Corp.*, 321 Mich. 21, and cases therein cited.

Finally, defendant contends that the agreement, as herein construed, is unenforceable against defendant in equity because it is unjust and unconscionable in that (1) it lacks mutuality of remedy and (2) is a contract in perpetuity as to defendant, but not as to plaintiffs, for the reason that Standard may terminate on 6 months' notice while no such right is reserved to defendant.

(1) In supporting the first phase of this contention defendant cites such cases as *Gillette* v. *Metzgar Register Co.*, 243 Mich. 48, and others, involving only 2 parties to the contract, in which decree for specific performance would have been inequitable for other reasons and particularly because of the fact that the plaintiff who sought enforcement had neither given a consideration to anyone or suffered a detriment nor could he be compelled to do either under the agreement. This is not such a case. Here there were 3 parties to the contract. Standard was required and could have been compelled to pay, and apparently has paid, Plastray $30,000 for sales pro-

motion; it has spent over $100,000 for tooling and equipping itself to perform its part under the contract; it could be compelled by Plastray, until termination of the contract, to manufacture and deliver articles to Plastray's customers and to pay to the latter a percentage of collections and a royalty. For cases involving 3-party agreements under which mutuality of remedy was lacking in favor of defendant, but where equitable relief was nonetheless granted plaintiff because he had paid a consideration, not to defendant but to the third party, see *Arctic Dairy Co.* v. *Winans, supra,* and *Thompson* v. *Andrus,* 73 Mich. 551. The doctrine of mutuality usually resolves itself into a question of what justice requires under the circumstances of the particular case. Whatever might have been the inequities attending specific performance in the cases cited by defendant, no such inequities exist here. In fact, it would be most inequitable and utterly unconscionable, after defendant has induced Standard to help him launch a new venture and to expend large sums of money to make possible the manufacture and sale of his invented devices in exchange for his grant to it of exclusive rights under his present and future patents, to now permit him, on the theory that mutuality of remedy is lacking as to him, to escape performance of his agreement simply because he has, through the employment of a corporate front, brought about a contractual arrangement in which the consideration from Standard flows directly to his corporation and thus only indirectly to him and in which the obligations assumed by Standard are enforceable by his corporation rather than by him.

(2) Supporting its theory that equity will not grant specific performance when the contract is terminable by one of the parties thereto but not by the other, defendant relies chiefly on two cases: *Rust* v. *Conrad,* 47 Mich. 449 (41 Am. Rep. 720),

in which it was held that a court cannot be called upon to do a vain thing by granting plaintiff specific performance of an option for a lease when the terms of the intended lease would permit plaintiff, as lessee, to terminate the lease at any time; also, *Garlock v. Motz Tire & Rubber Co.,* 192 Mich. 665, in which it was held that a contract of agency, which leaves the agent free to terminate relations with his principal at will, ought to be construed so as to leave the principal free to discharge the agent at will. In such situations it is obvious, of course, that there are corresponding benefits under the contract flowing from the first party to the second and from the second party to the first, which are parallel, continuous, contemporaneous and coextensive and that, hence, termination of the contract by either party at any particular time would leave both in substantially *status quo ante,* thus resulting in no substantial injustice to either party. In the case at bar, however, Standard was required to and did make a large initial outlay for which it could not receive a contemporary, corresponding benefit. Rather, the benefit to it was to come in the future. On the other hand, defendant's corporation, Plastray, was provided under the agreement with $30,000 at the outset for which it was to perform in the future. In consequence, termination at any time by defendant might not leave the parties in *status quo ante* and refusal to grant specific performance would, accordingly, work a hardship and result in an injustice. *Hobbs v. Brush Electric Light Co.,* 75 Mich. 550; *Stearns v. Railway Co.,* 112 Mich. 651; *Raymond v. White,* 119 Mich. 438, and *Western Newspaper Union v. Kitchel,* 201 Mich. 121, are cases in which agreements calling for a continuing performance terminable on plaintiffs' part but not on defendants' were held enforceable at law by plaintiffs because they had paid substantial considerations. Nor

would it be a vain thing for the court to grant Standard specific performance and to enjoin defendant from further breaches of the contract merely because Standard may terminate on giving 6 months' notice, in view of the detriment suffered and expenditures incurred by Standard under the contract which make an early termination by it unlikely. Defendant's theory in this connection is akin to the one of "lack of mutuality," on which subject it is said in 5 Williston on Contracts, § 1440:

"Where the contract is executory on both sides, the court may still give specific performance if it is satisfied that the person seeking relief will continue to perform. This may be shown by past conduct; or the person seeking specific performance may have such a strong economic interest in carrying out of the contract by reason of the extensive investment of his funds and labor that default on his part is highly improbable."

In the foregoing we do not undertake to pass on the facts, but, as we must in an appeal from an order dismissing plaintiffs' bill of complaint, take all well-pleaded facts in the bill as true. The order dismissing is reversed and the cause remanded for further proceedings, with leave granted plaintiffs to file an amended bill within 30 days from the filing of this opinion. Costs to plaintiffs.

Sharpe, C. J., and Bushnell, Boyles, Reid, North, Butzel, and Carr, JJ., concurred.