RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2004 FED App. 0092P (6th Cir.)
File Name: 04a0092p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

NILAC INTERNATIONAL
MARKETING GROUP,
*Plaintiff-Appellant,*

No. 02-2212

*v.*

AMERITECH SERVICES, INC.,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-71116—Arthur J. Tarnow, District Judge.

Argued: February 6, 2004

Decided and Filed: March 30, 2004

Before: NELSON, GILMAN, and ROGERS, Circuit
Judges.

_____

#### COUNSEL

**ARGUED:** Jeffrey B. Morganroth, MORGANROTH &
MORGANROTH, Southfield, Michigan, for Appellant.
Lawrence G. Campbell, DICKINSON WRIGHT, PLLC,
Detroit, Michigan, for Appellee. **ON BRIEF:** Jeffrey B.

Morganroth, Mayer Morganroth, Daniel E. Harold,
MORGANROTH & MORGANROTH, Southfield, Michigan,
for Appellant. Lawrence G. Campbell, Paul R. Bernard,
Jennifer K. Nowaczok, DICKINSON WRIGHT, PLLC,
Detroit, Michigan, Rawle Andrews, ANDREWS & BOWE,
Washington, D.C., for Appellee.

_____

#### OPINION

_____

ROGERS, Circuit Judge. The question presented in this
breach of contract action is whether there were triable issues
of fact as to whether a contractual agreement between NILAC
International Marketing Group ("NILAC") and Ameritech
Services, Inc. ("Ameritech") obligated Ameritech to include
NILAC in Ameritech's bid for the public pay telephone
concession at Detroit Metropolitan Wayne County Airport.
NILAC maintains that the contract with Ameritech and
Ameritech's extrinsic manifestations after the execution of the
agreement indicated mutual assent to include NILAC as the
prepaid calling card concessionaire in Ameritech's bid.
Ameritech counters that the agreement provided only for the
inclusion of NILAC as the concessionaire in a
contemporaneous, separate bid for local-only telephone
services. The district court awarded summary judgment in
favor of Ameritech. Because the contract was at least
ambiguous, and because NILAC raised genuine issues of
material fact as to whether the contract should be read in
NILAC's favor, we reverse the judgment of the district court
and remand this matter for further proceedings.

NILAC is a general partnership organized under Michigan
law with its principal place of business in Wayne County,
Michigan. NILAC is engaged in the marketing, sale and
distribution of prepaid telephone calling cards. Ameritech is
a corporation organized under Delaware law with its principal

place of business in Chicago, Illinois. Ameritech is a major provider of telecommunications services and owns roughly 250,000 public telephones in the Great Lakes region.

In 1998, Wayne County sought bids from contractors to provide public pay telephone services in the Detroit Metropolitan Wayne County Airport, as well as in several other county facilities. In a document styled "Request for Proposals, Local Public Payphone Concession, Detroit Metropolitan Wayne County Airport" ("RFP"), Wayne County sought bids for three different categories of service. In the first category ("Category I"), the county sought bids to provide service for calls within the local calling area. The second category ("Category II") sought bids to provide solely long-distance services. The third category ("Category III" or "Turnkey") sought bids to provide both local and long-distance calling services. The county would either award one Category III contract to a contractor able to provide both local and long-distance services, or it would award contracts to one Category I bidder and one Category II bidder; the two successful bidders would then team for the provision of all services.

Ameritech chose to submit bids for both Categories I and III. Ameritech was legally empowered under its telecommunications tariff to provide local services, but not to provide long-distance services. Therefore, submitting a viable Category III bid necessitated that Ameritech team with a telecommunications provider able to provide long-distance services. Ameritech consequently agreed with AT&T to submit jointly a Category III bid.[1]

Wayne County's bid procedure required that Ameritech seek the inclusion of Disadvantaged Business Enterprises

---

[1]AT&T is not a party to this litigation.

("DBE") in its prospective provision of services.[2] Ameritech sought NILAC's participation as one of its DBE subcontractors in its bid. The parties agreed to work together in providing Ameritech's response to the RFP. To this end, the parties entered a teaming agreement that provided, in relevant part:

> The Parties agree to cooperatively prepare a single response to a certain Request for Proposal for a Local Public Payphone Concession at Wayne County Department of Airports and other various Wayne County Facilities, ("RFP"). The Parties further agree that Ameritech shall be represented as the primary bidder, and NILAC shall be represented as one of Ameritech's Disadvantaged Business Enterprise (DBE) partner [sic] . . . In exchange for Ameritech's invitation to NILAC to participate in the RFP process as Ameritech's DBE partner, NILAC agrees not to participate in the RFP bidding process with any third party bidder.

> In the event Ameritech is awarded the contract for the Local Public Payphone Concession at Wayne County Department of Airports and other various Wayne County Facilities, the Parties shall enter into a subcontract agreement which shall set forth the terms and conditions of NILAC's participation as a subcontractor for Ameritech.

The contract was executed by Charles Mosley on behalf of Ameritech, and by Kevin Warrenton for NILAC. On the same day, the parties entered into a standard form non-disclosure agreement by which they agreed not to reveal confidential information exchanged for purposes of

---

[2]Wayne County appears to consider DBE's to be businesses that are primarily minority-owned, start-ups or businesses from economically depressed areas. The parties stipulate that NILAC is a DBE.

developing the bid proposal. Both documents were prepared by Kurt Moser, a paralegal in Ameritech's legal department. NILAC alleges that, after the teaming agreement was executed, NILAC and Ameritech discussed the details of the calling card concession. NILAC also maintains that it entered into agreements with third parties to sell calling cards with the logos, trademarks and likenesses of various Detroit area professional sports franchises.

When Ameritech submitted its Category I and III bids in May 1998, however, it included NILAC only in its Category I bid. The prepaid calling card provision of Ameritech's Category III bid instead contained the language that "AT&T will be utilizing a certified Wayne County DBE for 100% of this concession." NILAC did not learn that it had not been included as the prepaid calling card concessionaire in the Category III bid until December 1999, well after Ameritech was awarded the Category III contract.

On September 24, 1998, Ameritech made a presentation to a Wayne County committee regarding its bid for the Category III concession. Ameritech included its various bidding partners, including NILAC and AT&T. At this presentation, Ameritech held out NILAC to its other bidding partners and to Wayne County as its prepaid calling card concessionaire. Warrenton was invited to speak to the committee with regard to NILAC's participation in the bid.

Mosley, the Ameritech official who executed the teaming agreement with NILAC, testified in his deposition that he did not learn until December 1999 that NILAC had not been included in the Category III bid. After learning early in 1999 that Ameritech had been awarded the Category III contract, NILAC attempted on several occasions to contact Ameritech to discuss a subcontract agreement. Finally, in December 1999, Ameritech's general manager of sales contacted Warrenton to notify him that NILAC would not be included in the Category III contract.

On February 12, 2001, NILAC filed a five-count complaint against Ameritech in the Circuit Court for Wayne County, alleging breach of contract, fraud, conversion, breach of implied contract, and tortious interference with business relations. On March 21, 2001, Ameritech removed the lawsuit to the United States District Court on the basis of diversity jurisdiction. At the close of discovery, Ameritech filed a Motion to Dismiss, or Alternatively for Summary Judgment, or for a Declaratory Judgment, arguing that the teaming agreement and non-disclosure agreement did not oblige Ameritech to grant NILAC a subcontract for the prepaid calling card concession.

The district court granted Ameritech's motion for summary judgment. The district court first found that the language "In the event Ameritech is awarded the contract for the Local Public Payphone Concession" indicated an unambiguous agreement to include NILAC in the Category I proposal alone. Second, the district court concluded that, because the teaming agreement, while prohibiting NILAC from teaming with other bidders, contains no language restricting *Ameritech* from teaming with other parties, Ameritech was free to contract with other parties in connection with its Category III bid. This appeal followed.

We review *de novo* a district court's decision to grant summary judgment. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 521 (6th Cir. 1997). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a factual issue is genuine for the purposes of summary judgment, a court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

NILAC presented sufficient evidence for reasonable jurors to conclude by a preponderance of the evidence that it is entitled to prevail on its breach of contract claim. First, the operative language in the teaming agreement is ambiguous. Second, NILAC presented sufficient evidence to establish that its understanding of the operative terms is the agreed-upon meaning of those terms.

Initially, we note that Michigan law applies to the analysis of the teaming agreement. As a federal court sitting in diversity, we apply the choice-of-law provisions of the forum state. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Where, as here, a contract contains no express choice-of-law provision, Michigan courts apply the law of the forum state unless (1) there is no substantial relationship between the forum state and the contract or (2) the application of the forum state's law would conflict with a policy prerogative of a state with a greater interest in the contract than the forum state. *See Kipin Indus., Inc. v. Van Deilen Intern., Inc.*, 182 F.3d 490, 493 (6th Cir. 1999) (explaining that Michigan courts follow the choice-of-law rules of the Restatement (Second) of Conflict of Laws). Neither is the case here; therefore, Michigan law governs the interpretation of the teaming agreement. The non-disclosure agreement contains an apparently valid forum-selection clause which subjects it to Illinois law.[3]

---

[3] Ameritech suggested, both in its briefs and at oral argument, that we should treat the teaming agreement and the non-disclosure agreement as a unified agreement so that the forum-selection and merger clauses contained in paragraph 16 of the non-disclosure agreement apply to the teaming agreement. We decline to do so, because under the laws of both Michigan and Illinois, the parties must manifest clearly an intent to incorporate an outside document into a contract. *See, e.g., 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (applying Illinois law in explaining that a reference to an outside document must show an intent to incorporate that document into the contract); *Forge v. Smith*, 580 N.W.2d 876, 881 n.21 (Mich. 1998) (noting that incorporating instrument

Under Michigan law, the question of whether contractual terms are ambiguous is a question of law. *Port Huron Educ. Assn., MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996). If contract language is clear and unambiguous, the meaning of that language is also a question of law; the meaning of ambiguous language, however, is a question of fact. *Id*.

The teaming agreement is at least ambiguous as to NILAC's role in Ameritech's bid submissions for the public payphone concession. Contrary to Ameritech's assertion, the contract phrases "single response" and "Local Public Payphone Concession" do not together convey the unambiguous meaning that NILAC was to be a participant only in the Category I bid for local public payphone service.

Ameritech argues that the phrase "single response" indicates that NILAC would be included in just one response to the RFP—a response to the Category I request. This reading ignores the possibility that "single response" could also mean that Ameritech would provide the *collective* response of both parties to the bid request. The latter reading is borne out by the provisions that the parties would "cooperatively prepare" their response and that Ameritech would be the primary bidder. Moreover, the contract never contemplates that NILAC would respond individually to the RFP; on the contrary, NILAC's proposal for the provision of its services would be incorporated within the larger bid proposals of Ameritech. Even if Ameritech's understanding of the phrase were correct, there is no language in the contract

---

must clearly show intent that outside document be considered part of the contract). Although paragraph 16 incorporates an "Attachment A" into the agreement, Attachment A is merely a handwritten description of the venture. The non-disclosure agreement contains no reference to the teaming agreement. The teaming agreement likewise contains no reference to the non-disclosure agreement or any other attempt to incorporate it.

indicating whether the one response is to the Category I request or the Category III request—except the term "Local."

"Local" itself, however, is also ambiguous. The second paragraph of the teaming agreement states that the parties agreed to prepare a response to "a certain Request for Proposal for a Local Public Payphone Concession at Wayne County Department of Airports." This particular language tracks, nearly verbatim, the title of the RFP, which included requests for Category I, II, and III bids. At oral argument, NILAC suggested that Wayne County may have meant the term "Local" to refer to the location of the phones at the airport and county facilities. Even if this reading is not compelling, it is at least possible, given that the contract language tracks so closely the overall RFP language. Moreover, Ameritech chose this language in drafting the agreement. Ameritech is a sophisticated party and admits that this document was drafted by a member of its legal staff, presumably under the supervision of its in-house counsel. If Ameritech had intended to limit the scope of the teaming agreement to include NILAC in only the Category I bid, Ameritech could have used more specific language in drafting the document. Ameritech's understanding of "Local" is not required as a matter of law in the face of NILAC's equally plausible reading.

Moreover, NILAC's extrinsic evidence raises material issues of fact as to whether Ameritech breached its contractual obligations. Although the parol evidence rule precludes courts from using extrinsic evidence to alter the terms of a final and unambiguous contract, it does not bar the introduction of extrinsic evidence "to disclose ambiguity or to show that there is none, as well as to resolve any ambiguity proven to exist." *American Anodco, Inc v. Reynolds Metal Co.*, 743 F.2d 417, 422 (6th Cir. 1984) (citing *Goodwin v.*

*Coe Pontiac, Inc.*, 220 N.W.2d 664, 671 (Mich. 1974)).[4] If the trial court has determined that the contractual language is ambiguous, the jury should consider extrinsic evidence in determining the intended meaning of ambiguous language. *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). If, after a review of the relevant extrinsic evidence, the factfinder remains unable to determine the intent of the parties, the ambiguities are to be construed against the drafter of the contract. *Id*. at 454.

NILAC has introduced evidence showing that Ameritech's agent believed the contract to include both Category I and III bids, that Ameritech held NILAC out to Wayne County as its prepaid calling card provider for its Category III bid, and that Ameritech executives discussed the particulars of a prepaid calling card subcontract with NILAC's Warrenton after the contract had been signed. This is enough evidence, when considered in the light most favorable to NILAC, to create triable issues of fact for a jury.

In addition to its contract claim, NILAC also asserted four tort claims which were disposed of in the district court's summary judgment order. The district court found that these claims were derivative of NILAC's contract claim, and because the contract claim failed, the tort claims failed as well. In light of our decision to reverse the grant of summary judgment on the contract claim, we remand these claims for consideration by the district court.

---

[4] In 1976, the Supreme Court of Michigan applied a different test to determine whether the parol evidence rule applied—that is, whether the extrinsic evidence was inconsistent with the written agreement. *Union Oil v. Newton*, 245 N.W.2d 11 (Mich. 1976). "If there is no inconsistency, the parol evidence is admissible." *Id*. at 12. The differently stated standard does not appear to lead to a different result in this case, where the extrinsic evidence is consistent with one possible reading of the written language.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **REVERSED**, and the matter is **REMANDED** to the district court for further proceedings consistent with this opinion.